Samuel DELK, Petitioner,

v.

Frank D. ATKINSON, Sheriff, Hickman County; Jim Rice, Circuit Court Clerk, Hickman County, Respondents.

No. 80–1011.

United States District Court,
M. D. Tennessee,
Columbia Division.

Oct. 6, 1980.

Lionel R. Barrett, Jr., William P. Redick, Jr., Nashville, Tenn., for petitioner.

Robert L. Jolley, Jr., Asst. Atty. Gen., Nashville, Tenn., for respondents.

## MEMORANDUM

WISEMAN, District Judge.

In this petition for the writ of habeas corpus, petitioner, Samuel Delk, has requested the Court to examine the record of his 1976 state murder trial under the standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to determine whether there was, as a matter of constitutional law, sufficient evidence to warrant the jury's verdict finding him guilty of second degree murder. *Jackson* requires a federal habeas court to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found a habeas petitioner guilty beyond a reasonable doubt. 443 U.S. at 319, 99 S.Ct. at 2789. The Tennessee Supreme Court reversed petitioner's conviction on the basis of certain trial errors,[1] *Delk v. State*, 590 S.W.2d 435 (Tenn.1979), but specifically found that there was sufficient evidence supporting the jury's verdict and thus remanded the case for retrial. *Id.* at 441–42. Delk is currently out on bail pending retrial, having spent three and one-half years in state custody after his conviction. He filed this habeas petition on April 15, 1980, and on June 26, 1980, this Court stayed further prosecution of petitioner in state court pending disposition of the petition.

Petitioner maintains that the evidence presented at his first trial does not satisfy the *Jackson* standard, and he further main-

---

1. *See* note 10 *infra*.

tains that, because the evidence was constitutionally insufficient, a retrial is barred under *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), which held that the double jeopardy clause bars retrial if a conviction is reversed on review because of insufficient evidence. In essence, petitioner argues that the rationale of *Burks* also bars retrial if a federal district court in a habeas corpus action finds that the evidence against the defendant fails to satisfy the *Jackson* test.

■ It is with the greatest reluctance that this Court or any federal court intrudes upon a state criminal proceeding in which the accused was found guilty by a jury properly instructed as to the requirement of proof beyond a reasonable doubt, a finding approved in turn by the intermediate appellate court, and finally by the state's court of last resort. However, the very purpose of federal habeas corpus is the protection and vindication of federal constitutional rights, and when these rights are imperiled, considerations of comity must give way. See *Jackson v. Virginia, supra*, 443 U.S. at 322, 99 S.Ct. at 2791; *Webb v. Court of Common Pleas*, 516 F.2d 1034, 1036 (3d Cir. 1975). Such is the situation presented by the instant case. Having scrutinized the record, the Court must conclude that if the constitutional requirement of proof beyond a reasonable doubt and the prohibition against double jeopardy are to have any meaning in our judicial system, the State of Tennessee cannot subject this petitioner to retrial. Accordingly, the writ of habeas corpus shall issue, and petitioner is to be released from bail. The Court further finds that as a matter of law, this judgment precludes a retrial of petitioner for the 1975 slaying of Harold Gipson in Centerville, Tennessee. The Court deems it unnecessary to order specific injunctive relief barring state retrial at this time, because the Court assumes that the State will act in good faith in light of the Court's decision and dismiss the charges against petitioner.

*Jurisdiction.*

■ Before examining the merits of petitioner's claim, the Court must ensure that this case lies within its habeas corpus jurisdiction. The Court must determine that the petitioner has stated a cognizable claim, that he is "in custody" for the purposes of the statutory requirement, that he has exhausted his available state remedies, and that this Court's judgment does not exceed its limited authority to interfere with state criminal proceedings. Although the Court has stated these requirements discretely, it should be obvious that they are related to a significant degree.

### A. The Cognizability of the Claim.

■ Petitioner claims that his retrial would violate the Fifth Amendment ban against double jeopardy, which was applied to the states through the due process clause of the Fourteenth Amendment in *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Claims based on the double jeopardy prohibition are cognizable in a federal habeas corpus action prior to a state retrial. *Gully v. Kunzman*, 592 F.2d 283, 286–87 (6th Cir.), *cert. denied*, 442 U.S. 924, 99 S.Ct. 2850, 61 L.Ed.2d 292 (1979). The essence of petitioner's claim is that his retrial would violate the double jeopardy ban because there was insufficient evidence presented at his first trial, and thus the state should not be allowed "a second bite at the apple." The legal theory behind this claim derives from a mixture of three recent Supreme Court decisions: *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); and *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

*Burks* arose from a federal criminal trial that resulted in conviction of the defendant. The Sixth Circuit reversed the conviction after finding that there was insufficient evidence, and remanded the case to district court for retrial. After granting certiorari, the Supreme Court reversed the Sixth Circuit, holding that "the double jeopardy

clause precludes a second trial once the reviewing court has found the evidence legally insufficient." 437 U.S. at 18, 98 S.Ct. at 2150. The *only* remedy at that point is the direction of a judgment of acquittal. *Greene v. Massey, supra*, a companion case to *Burks*, applied this principle to state criminal proceedings.

*Jackson v. Virginia, supra*, arose from a federal habeas corpus proceeding in which the petitioner claimed that his Virginia murder conviction was based on insufficient evidence. The district court applied the "no evidence" standard of review first announced in *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), and granted the writ. The Fourth Circuit reversed, and on certiorari the Supreme Court affirmed the court of appeals. However, in order to implement more fully the due process standard of *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), that protects a defendant against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged, *id.* at 364, 90 S.Ct. at 1072, the *Jackson* Court articulated a new standard of review for district courts to apply in habeas proceedings challenging the sufficiency of the evidence in a state criminal trial. The Court held that the federal court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof of guilt beyond a reasonable doubt. 443 U.S. at 324, 99 S.Ct. at 2792.

█ Petitioner combines *Jackson, Burks*, and *Greene* and concludes that they require this Court to apply a *Jackson* review to his now—reversed state conviction prior to retrial, because if the evidence at the original trial failed to satisfy the *Jackson* test, a retrial would unconstitutionally expose him to double jeopardy. So far as the Court has

been able to determine, this is a case of first impression. However, the logic of petitioner's proposition is inescapable, and the Court must accept it. Although neither *Burks* nor *Greene* specifically states that a subsequent state retrial would violate the double jeopardy clause if a federal habeas court, instead of an appellate court, finds that a state conviction was based on insufficient evidence, there is no reasonable basis for concluding otherwise. It is, after all, the nature of the right, and not the nature of the reviewing court, that bars a retrial if the reviewing court finds that the original conviction was based on constitutionally deficient evidence.[2] The only court that has considered the question in a reported decision concluded that state retrial is barred if the district court finds that a state conviction fails to satisfy the *Jackson* standard, *Holloway v. McElroy*, 474 F.Supp. 1363, 1365 (M.D.Ga.1979), and this Court concludes likewise.

There is, however, a question of whether a *Jackson* review may be applied by way of a habeas corpus action in the situation presented by the instant case. Petitioner's conviction was reversed by the Tennessee Supreme Court, but it found that there was sufficient evidence to support the conviction. Petitioner now wants this Court to intervene prior to his retrial and, in effect, determine whether the state court erred in remanding his case for a retrial. Although this Court frowns upon the prospect of its intervention in this fashion, the Court's duty is clear. Petitioner's constitutional rights are imperiled, because a retrial would subject him to double jeopardy if the evidence at his first trial was constitutionally insufficient. *Holloway v. McElroy, supra*. Federal habeas courts have the duty to intervene prior to trial when the prohibition against double jeopardy is at stake. *Gully v. Kunzman, supra*.[3] Moreover, there is no

---

**2.** Significantly, both *Burks* and *Greene* refer to the determination of a "reviewing court" rather than limiting the reference to appellate courts. *Burks v. United States*, 437 U.S. at 18, 98 S.Ct. at 2150; *Greene v. Massey*, 437 U.S. at 24, 98 S.Ct. at 2154.

**3.** The following passage from *Gully* gives the Court pause: "Retrial after reversal does not itself offend the double jeopardy clause. Since petitioners' earlier convictions were reversed on grounds unrelated to the sufficiency of the evidence, the State's right to retry them for the same offenses is clear." 592 F.2d at 288. The

dispute that this Court must apply the *Jackson* standard in determining whether the evidence was constitutionally sufficient.[4]

Consequently, this Court finds that it has the jurisdiction to make a *Jackson* review at this juncture for the purposes of determining whether petitioner's retrial would subject him to double jeopardy. Stated another way, the Court concludes that petitioner has stated a cognizable claim for habeas corpus relief by asking this Court to make a *Jackson* review of the record to determine whether his retrial would violate the double jeopardy clause.

### B. *Custody Requirement.*

28 U.S.C. § 2254(a) requires that a petitioner be "in custody pursuant to the judgment of a state court." The Court finds that, as a technical matter, this petition fails to state a claim under section 2254, because the reversal of petitioner's state conviction nullifies the state court judgment that placed him in custody.[5] Petitioner should have filed suit under 28 U.S.C. § 2241(c)(3), which empowers the district courts to grant the writ of habeas corpus to a petitioner "in custody in violation of the Constitution," without the requirement that the custody be pursuant to a state court judgment. *See Moore v. DeYoung,* 515 F.2d 437, 441–42 (3d Cir. 1975) (discussing the distinction between section 2254 and section 2241). Accordingly, the Court will treat this petition as having been filed pursuant to section 2241.

The next question is whether petitioner's release on bail pending retrial[6] qualifies as custody for the purposes of section 2241(c)(3). That very question was answered affirmatively by the Third Circuit in *Russo v. Superior Court,* 483 F.2d 7, 12 (3d Cir.), *cert. denied,* 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973), which relied on the Supreme Court's decision in *Hensley v. Municipal Court,* 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973).[7] This Court is persuaded by the Third Circuit's analysis, and therefore finds that petitioner is in custody for the purposes of seeking habeas relief under section 2241(c)(3).

### C. *Exhaustion.*

In its motion to dismiss the petition, respondents have relied almost exclusively on their argument that petitioner has not exhausted his state remedies, as required in any habeas corpus action. *See Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Gully v. Kunzman, supra,* 592 F.2d at 286–87; *Fain v. Duff,* 488 F.2d 218, 223 (5th Cir.) *cert. denied,* 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666 (1975) (exhaustion requirement applies to actions under section 2241, despite the absence of a specific statutory requirement like the one found in section 2254(b)). Respondents insist that even though petitioner has presented his evidentiary challenge to the state courts, his failure to raise the double jeopardy issue in state court bars federal relief at this time. This argument

---

petitioners in *Gully* were not raising a habeas corpus challenge based on the sufficiency of the evidence, however. Moreover, *Gully* was decided prior to the Supreme Court's decision in *Jackson* that articulated a new standard for reviewing sufficiency of the evidence.

4. Unlike federal habeas courts, state appellate courts are not *constitutionally required* to apply the *Jackson* standard, because it has never been held that states are constitutionally required to provide appellate review at all.

5. Petitioner could argue that he is still in custody pursuant to a state court judgment because the supreme court's disposition of his case subjects him to a retrial and, correspondingly, his conditional release on pretrial bail. It is unnec-

essary to consider this potential argument, however, for the reasons discussed in text.

6. The Court notes once again that petitioner was in prison for three and one-half years after his conviction until the reversal by the state supreme court.

7. The habeas petitioner in *Hensley* had been released on his own recognizance following a state court conviction and one year prison sentence while he pursued his state remedies. The Supreme Court held that the petitioner satisfied the custody requirement even though he had been released on his own recognizance, emphasizing that he was subject to restraints "not shared by the public generally." 411 U.S. at 351, 93 S.Ct. at 1574.

ignores the substance of petitioner's claim, however. Petitioner's double jeopardy claim follows as a matter of law from his assertion that the evidence at his 1976 trial was constitutionally insufficient, an argument that was extensively considered and ultimately rejected by both Tennessee appellate courts. The double jeopardy claim requires no independent consideration of any sort, because it is simply the legal corollary of a reviewing court's finding of evidentiary insufficiency. *See Burks v. United States, supra.* The Tennessee courts have had the opportunity to consider the evidentiary challenge that is the essence of petitioner's double jeopardy claim in this Court, and this opportunity fully satisfies the exhaustion requirement. *See Rachel v. Bordenkircher,* 590 F.2d 200, 203 (6th Cir. 1978).

### D. Interference With State Criminal Proceeding.

■ Because this Court's judgment that the insufficiency of the evidence at his first trial precludes petitioner's retrial, *see Holloway v. McElroy, supra,* 474 F.Supp. at 1365, a question arises as to the applicability of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Younger* and its progeny [8] hold that in the absence of exceptional circumstances, federal courts may not interfere with pending state prosecutions. The basic premise of *Younger* is that considerations of comity require that federal courts not interfere with state criminal proceedings until the state has had the opportunity to correct the asserted constitutional defect in the prosecution at issue, e. g., that a criminal statute is unconstitutional, as in *Younger. See id.* at 44, 91 S.Ct. at 750. But as Chief Judge Irving Kaufman recognized in the recent case of *Drayton v. Hayes,* 589 F.2d 117, 121 n.7 (2d Cir. 1979), *Younger* is "inapposite" in a situation in which the very constitutional right at issue is the right not to be exposed to multiple trials, and the petitioner has exhausted his available state pretrial remedies. *Cf. Mincey v. Arizona,* 434 U.S. 1343, 1344, 98 S.Ct.

23, 24, 54 L.Ed.2d 56 (1977) (Rehnquist, Circuit Judge) (suggesting that double jeopardy claims form an exception to the *Younger* doctrine); *Gully v. Kunzman, supra,* 592 F.2d at 286–88 (same). This Court is similarly persuaded that the *Younger* doctrine is inapplicable in the circumstances presented by this case, because petitioner's fundamental right not to be retried cannot, by its very nature, be vindicated in state posttrial proceedings.

The same result can be reached by holding that this case presents one of the "exceptional circumstances" that form an exception to the *Younger* doctrine, *see* 401 U.S. at 53–54, 91 S.Ct. at 754–755, because petitioner faces the "irreparable injury" of being twice placed in jeopardy, instead of the "cost, anxiety, and inconvenience of having to defend against a *single* criminal prosecution" that the *Younger* Court deemed insufficient to warrant interference prior to trial. *Id.* at 46, 91 S.Ct. at 751. *See Webb v. Court of Common Pleas,* 516 F.2d 1034, 1039 n.18 (3d Cir. 1975). Whether there is any distinction between holding that *Younger* is "inapposite" in this situation and the alternative holding that the instant case forms an "exception" to the *Younger* doctrine is a question for semanticists. In any event, the Court is satisfied that *Younger* poses no bar to federal intervention in this case.

The Court takes this opportunity to note that its July 26, 1980, Order staying further prosecution of petitioner until his federal habeas action is disposed of was based on the Court's preliminary findings that an irreparable injury would occur unless state prosecution was stayed, and that petitioner had exhausted available state remedies. Given those findings, the Court concluded that it should exercise its power under 28 U.S.C. § 2251 to stay state proceedings while this habeas petition was pending. Without these findings, a stay pursuant to section 2251 would have been inappropriate. *See Sparks v. Garrison,* 446 F.Supp. 649, 650–51 (M.D.N.C.1978), *aff'd without op.,* 612 F.2d 1310 (4th Cir. 1979).

---

**8.** *E. g., Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Kugler v. Helfant,*

421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975).

■ Having concluded that it may properly provide relief on this petition, the Court now turns to the merits of petitioner's claim.

### The Merits.

Petitioner was convicted of second degree murder after a five–day trial in August 1976 in the Circuit Court of Hickman County. The jury deliberated for approximately seven hours before reaching its verdict. Petitioner was indicted for first degree murder, which at that time carried a mandatory death penalty, and thus his conviction of the lesser included offense and his fifty–year sentence represented something of a triumph for the defense. The trial judge denied petitioner's motion for directed acquittal at the end of the State's case and a renewed motion after the jury's verdict was returned. Petitioner elected not to put on any proof in his own behalf. On appeal to the court of criminal appeals and the Tennessee Supreme Court, petitioner specifically challenged the sufficiency of the evidence against him, arguing that it was insufficient as a matter of law. In reviewing the evidence, the court of appeals applied a standard that required petitioner to show that the evidence preponderated against the jury's verdict. The supreme court did not articulate its standard of review; the court concluded, however, that the circumstantial case against Delk "would support a finding beyond a reasonable doubt that no one else could have entered the store [where the victim was slain], committed the crime, and left unobserved." *Delk v. State, supra,* 590 S.W.2d at 442.

Whether this statement implies that the supreme court was applying the *Jackson* standard is unclear;[9] Justice Henry's dissent (*Delk* was a four–one decision) argued that the court had erred by not applying the *Jackson* test, *id.* at 444–45, which would strongly suggest that the court's standard of review was lower than that required of this Court by *Jackson*. In any event, the standard of review applied by the Tennessee courts is not legally significant, because there is no presumption that the state courts' record findings are correct. *Drayton v. Hayes, supra,* 589 F.2d at 122 n.9; *see* 28 U.S.C. § 2254(d)(8). Nevertheless, the Court deems it appropriate to emphasize that the standard of review applied by the court of criminal appeals was far less rigorous than the *Jackson* standard, and if Justice Henry's dissent is any indication, the Tennessee Supreme Court also applied a more lenient standard than that required of this Court.

Having made these preliminary observations, the Court will now turn to the record, examine it in the light most favorable to the prosecution, and determine whether any rational trier of fact could have found petitioner guilty beyond a reasonable doubt. This task is made easier by petitioner's decision at trial not to produce any evidence in his own behalf, and thus there is no danger of this Court inadvertently giving inordinate weight to the defense's proof. It should also be noted that the supreme court reversed on the basis of three cumulative errors that it concluded were not harmless.[10] This is important because a review-

9. As of July 1, 1979, the new Tennessee Rules of Appellate Procedure require that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if, considering the whole record, the evidence fails to establish guilt beyond a reasonable doubt." Rule 13(e), Tenn.R.App.P. That rule was not in effect at the time the supreme court reviewed petitioner's case, however.

10. The supreme court held that it was reversible error for the prosecutor to have called Ulysses Gipson, the victim's brother, who testified that sometime before the murder, petitioner's father came into Gipson's Market with a sack full of bullets. The defendant objected, and the

trial court eventually sustained the objection because the State could not show the relevance of this incident. Ulysses Gipson's best estimate of when this incident occurred was that it "wasn't too awfully long" before the murder. Nevertheless, the jury heard the testimony about the bullets before it was sent out during the colloquy relating to the objection.

The prosecutor also asked a witness if he had ever seen petitioner with a handgun. Once again the jury was excused, and during the colloquy it was shown that the witness had seen petitioner with a handgun on two occasions, but his estimate was that it was eight or nine months prior to the murder. The prosecu-

ing court's ultimate finding that the evidence was insufficient as a matter of law is far less of a slap at a jury's fact–finding skills when that jury was exposed to prosecutorial misconduct that presumably tainted their deliberations.

The State's case established or tried to establish three links in a chain between petitioner, Samuel Delk, and the murder of Harold Gipson. First, and most importantly, the State proved that petitioner entered Gipson's Market very near the time of the murder, and if anyone else was the slayer, he or she operated in a very narrow time frame. In short, the State proved that petitioner was present and had the opportunity to perpetrate the crime. Second, the State attempted to show a motive on petitioner's part by trying to prove that there was animosity between petitioner and the victim, apparently based on debts owed by petitioner to Gipson. Third, the State attempted to establish a link between some papers connected with Gipson's business that Mrs. Rose Clayborn found next to her mailbox on the morning following the tragedy. The State proved that Dan Delk, petitioner's brother, had driven by the Clayborn house a few hours after the murder, and the State's theory was that petitioner had taken the papers after the murder, transferred them to Dan, and that Dan Delk threw the papers out of his car window as he passed the Clayborn house that night. The Court will examine these links in order, drawing all inferences in the State's favor that the evidence will rationally support. Only those facts that arguably give rise to inferences favorable to the State are discussed in detail; a more thorough discussion of the case in all its aspects can be readily found in the supreme court's reported decision. *Delk v. State*, 590 S.W.2d 435 (Tenn.1979).

A. *Delk's Presence and Opportunity.*

At approximately 6:09 p.m. on the evening of November 12, 1975, Dispatcher H. R. Atkinson of the Centerville Police Department received a telephone call from Floyd Stone that was the first report of Gipson's murder. Stone's friend, Goon Gilbert, had noticed Gipson's body lying near the front door of his store as Stone was driving Gilbert past Gipson's Market that night on the way to a clinic. Although it is clear that Stone and Gilbert discovered Gipson's body at some time prior to the telephone call, at this point in the discussion it is sufficient to establish 6:09 p. m. as the upper bound on the time of discovery.[11] The length of time between the discovery and the phone call was a hotly disputed issue at trial. From the State's standpoint, it was important to show that the discovery preceded the telephone report by several minutes, thereby limiting the interval between petitioner's admitted visit to the store and the time of discovery as much as possible. The Court will return to this issue after placing it in context with the remaining "chronological" evidence.

From the State's viewpoint, it is also advantageous to place petitioner in the store as late as possible; as the time of petitioner's entry approaches 6:09, the probability of his guilt increases. There are objective chronological landmarks that are helpful. The lower bound on petitioner's time of entry is 5:50 p. m., the time on Buford Hornbeak's watch when he left Gipson's store to go watch the television news. Thirteen–year–old Sidney Pigg left Gipson's store five minutes after Hornbeak, according to Pigg's testimony. Pigg's departure left Gipson alone in the store.

tor then withdrew from that line of questioning. However, the jury had heard the question, and had heard the prosecutor say that he could show its relevance.

Finally, in the prosecutor's closing argument, he pointed at petitioner's brother among the spectators in the courtroom and stated to the jury that if defense counsel's argument was to be believed, he should have called petitioner's brother as a witness.

The Tennessee Supreme Court concluded that these instances of prosecutorial misconduct cumulatively resulted in prejudicially influencing the jury against the defendant, and required reversal. 590 S.W.2d at 440.

11. The Court considers all of the times mentioned in the record approximate, and finds it unnecessary to precede every reported time with that adjective.

While walking south on Columbia Avenue, Pigg encountered petitioner walking north towards the market, and they greeted each other. Their meeting point lay near the front of Louise Chavers' house, and reenactments established that an average person would require forty–five seconds to reach Gipson's Market from the point at which Pigg encountered Delk. A diagram is set forth below for reference.

Based on Record Findings in Delk v. State, 590 S.W.2d 435 (Tenn. 1979). The exact degree of curve is unknown, but the drawing is based on Justice Henry's statement that it is a "pronounced curve."

Approximate Distance from Chavers' Front Door To Gipson's Entrance = 140 ft.

At this point, petitioner's statement to Sheriff Atkinson on the day after the murder becomes relevant. It contains statements on the part of petitioner that served the defense and prosecution equally well, although petitioner protested his innocence during that interview, as he has throughout the five years following the murder. In his statement to Sheriff Atkinson, petitioner mentioned his encounter with Sidney Pigg, an incident unknown to the Sheriff at that time. He admitted going into the store after encountering Pigg, and said he bought a pack of cigarettes and matches for a total of 52 cents.[12] According to petitioner, this transaction consumed thirty to forty–five seconds, during which time Gipson continued a telephone conversation that was in progress when petitioner entered. Interestingly, the record is devoid of any further reference to the existence of Gipson's interlocutor, if there was one. The fact that the phone was off the hook when Floyd Stone and Goon Gilbert entered suggests that Gipson may have been on the phone when he

was killed, but it is not conclusive. In sum, what might be referred to as the "telephone evidence" provides no inferences for either side to draw, though it provides a source of boundless speculation for the mystery—minded.

Petitioner told the Sheriff that after completing his purchase, he headed back south towards Harold's Cafe, a tavern owned by the victim, Harold Gipson, and his arrival at the tavern was confirmed by State witnesses, though they were unsure of the time. As he walked down Columbia Avenue, he heard Louise Chavers calling her boarder and next–door neighbor, Mr. Small, to supper. According to petitioner's statement, he looked at her and she looked at him. Louise Chavers denied seeing petitioner, however. From this, it could be inferred that petitioner was actually proceeding in stealth when he heard Mrs. Chavers calling Small instead of walking out in the street, as he claims. This is because Louise Chavers did in fact walk over to Mr. Small's house to call him to supper shortly after 6 p. m., according to her clock, and there is no dispute that petitioner did hear her as he was *leaving* the store.[13]

In itself, this evidence provides a reasonable inference that petitioner left the store after 6 o'clock, an inference very prejudicial to him, but there is also one more chronological landmark that reenforces this inference—the honk of Floyd Stone's car. This landmark assumes critical significance. Goon Gilbert was at Vorgerine Walker's house waiting for Floyd Stone to pick him up for their fateful drive that would result in the discovery of Gipson's murder. When Floyd arrived, he honked his horn, a sound which Mrs. Chavers recalls hearing shortly after returning to her kitchen after calling Mr. Small to supper. According to Vorge-

---

12. After Gipson's murder, 50 cents appeared on the face of the cash register.

13. It would be better for the State's case to argue that he really heard her *before* he went into Gipson's, because that makes his time of entry even later. The record does not support that inference, however, primarily because

there was no testimony from Sidney Pigg about Mrs. Chavers calling to Mr. Small. Because Pigg met petitioner in front of Chavers' house, it would be unreasonable to conclude that petitioner actually overheard Mrs. Chavers before he went into the market, unless the State showed that Pigg had heard her also.

rine Walker, it was after 6 p. m. when Floyd Stone arrived, a conclusion she bases on her recollection that she was watching the television game show "Concentration," which came on at 6 p. m., when Floyd Stone arrived. The combined testimony of Mrs. Chavers and Vorgerine Walker supplies an inescapable inference that petitioner was certainly leaving the store, and was probably in the store, after 6 p. m., which narrows considerably the gap between his departure from the store and the discovery of Gipson's body.

However, upon examination, it becomes apparent that this crucial interval was rather substantial under the circumstances, even when the evidence is viewed, and even stretched, in the State's favor. First, it is clear that, regardless of whether petitioner was proceeding openly or by stealth, he was close to Louise Chavers when he heard her calling Small at Small's house, and thus he must have been out of Gipson's Market for at least a few seconds before hearing her. Next, Louise Chavers' reenactment of her actions that night, as testified to by Sheriff Atkinson, disclosed that one minute, seventeen seconds elapsed from the time she left her kitchen, called Mr. Small, reentered her house, and heard Stone's horn blow. In the light most favorable to the State, one would have to conclude that, at the very least, one–half minute elapsed between the time Delk left the store and the time Floyd Stone blew his horn.

At this point, Floyd Stone and Goon Gilbert's drive reenters the calculus. It is established that Delk had left the store before the honk, because he overheard Louise Chavers calling Small, which occurred sometime prior to the horn–blowing. The question now becomes how long it took

Stone and Gilbert to make their discovery after the honk. This was the subject of another reenactment, and Sheriff Atkinson timed the period from the honk to the discovery at one minute, fifty seconds, which appears to be the lowest possible limit on this crucial time interval.[14] In the light most favorable to the State, this chronological analysis reveals that at a bare minimum, approximately two and one–half minutes elapsed from the time petitioner left the store until Floyd Stone and Goon Gilbert arrived; half a minute from the time Delk left until Floyd Stone blew his horn, and one minute, fifty seconds from Stone's honk until the arrival at Gipson's Market, for a total of just about two and one–half minutes. Under this analysis, it is unnecessary to consider the question of how long Floyd Stone spent in the store before he ran to call the police, a question that was hotly disputed at trial. His badly impeached estimate of five minutes is helpful to the State's case, but even if he only spent a few seconds in the store, as Goon Gilbert's testimony would suggest, a rational trier of fact could still find that there were only two and one–half minutes between Delk's departure and Stone's arrival, and that is the critical interval.[15]

But what do these two and one–half minutes provide the State? At best, Delk's statement shows that he had the opportunity to kill Gipson, and the narrow time interval between his departure and Stone's arrival irrefutably shows that if someone else did it, he or she operated under very narrow time constraints. However, that inference falls short of proving that Sam Delk did it. The State combined this chronology with the fact that no one saw or heard anything

**14.** At trial, Floyd Stone testified that Vorgerine Walker came out and talked to him for two or three minutes after he arrived to pick up Goon Gilbert, but Floyd Stone's reenactment with Sheriff Atkinson allowed less than fifty–five seconds for their conversation. Even Sheriff Atkinson, who apparently placed great faith in his various reenactments, acknowledged that Floyd Stone did not wait "long enough" at Walker's house during the reenactment. Regardless of the length of this conversation, the

drive to the store, by itself, consumed fifty–five seconds during the reenactment.

**15.** Of course, the Court does not suggest that this is the analysis that the jury actually used, nor is that consideration even relevant. *Jackson v. Virginia, supra,* 443 U.S. at 319 n. 13. It is, however, the only reasonable analysis that provides the shortest possible interval between Delk's departure and the discovery of Gipson's body.

at Gipson's Market during this interval to argue that Delk must have done it, because no one saw anybody else enter or leave Gipson's Market. The failure of anyone to notice anything fails to provide any additional inferences that strengthen the State's case, however, because the State simply failed to prove that anybody was watching Gipson's Market during the time when Gipson was murdered.[16] This conclusion is amply demonstrated by the fact that no one saw Sam Delk enter or leave, or, for that matter, the arrival of Floyd Stone and Goon Gilbert.

██ In summary, the State's chronological proof showed beyond any question that Delk could have committed the murder. As a matter of law, however, that showing by itself cannot provide the proof necessary for conviction, because of the fundamental principle that mere presence at the scene of a crime, standing alone, never suffices to prove guilt beyond a reasonable doubt. The teachings of *Winship* and *Jackson* lead the Court to conclude that this principle is embodied in the concept of constitutional due process.

### B. *Motive.*

The State attempted to show that there was animosity between petitioner and the victim, thereby providing the highly relevant inference that petitioner had a motive to kill Gipson. According to the State's theory, this animosity was manifested by petitioner's practice of asking other people to make purchases at Gipson's Market for him, rather than doing it himself. Various witnesses testified that they had seen petitioner waiting outside while others went inside for him, but on the other hand, none of the witnesses testified that this was his exclusive practice, and in fact there was testimony that petitioner had entered the store himself on occasion. Moreover, the record shows that on the day of the murder, petitioner went into the store twice before his third entry at approximately 6 p. m.

The animosity between Delk and the victim allegedly arose from an incident in which Delk and his brother (unidentified) broke a door at Gipson's nearby beer joint during a scuffle, but the record shows that Delk had paid to fix the door. There is also testimony that petitioner owed Harry Gipson an undetermined amount of money for beer. Finally, Wayne Dansby testified that at some time prior to the murder, either petitioner or someone named Doug Cummins had suggested to him that they rob Gipson, but Dansby stated that "we was just kidding, you know."

From this evidence of animosity, a trier of fact could rationally conclude that petitioner was in debt to Gipson, and that he felt sufficiently uncomfortable around him to avoid personal contact, though not to an absolute degree. Although this evidence is relevant, it hardly approaches a level providing an inference that petitioner had a substantial reason for killing Gipson. Indeed, the court of criminal appeals, in its unreported decision, concluded that the evidence of "previous difficulty" did not appear serious, and the Tennessee Supreme Court also declined to give this evidence great weight. The evidence of motive adds little to the evidence that petitioner had the opportunity to kill Gipson; at best, it makes his guilt more probable, but it still fails to boost the State's case over the reasonable doubt threshold. To conclude otherwise is to say that anyone who owes a debt to a murder victim and who had the opportunity to commit the deed can be found guilty of murder on that proof alone, an irrational conclusion clearly at odds with *Jackson.* In order to find that the State satisfied the *Jackson* standard, the Court must now move on to the third and final link in the State's circumstantial chain.

### C. *Dan Delk's Drive and the Gipson Papers.*

On the morning of November 13, 1975, the day after the murder, Rose Clayborn found some papers near her mailbox located

---

16. Justice Henry's analysis on this point is most persuasive. *See Delk v. State*, 590 S.W.2d at 447 (Henry, J., dissenting). It should be noted that there is no dispute that the murderer used the front door, because both rear doors were bolted from the inside.

on the north side of the Duck River Bridge on Highway 100, the main highway passing through Centerville. Her testimony was that she lived on the right–hand side of the road as one drives from Centerville to Nashville (or Dickson), and the mailbox was just off the highway in front of her residence. According to Mrs. Clayborn, the papers were not there at 11:30 p. m. on the preceding night when she looked out of her window. Some of these papers belonged to Harold Gipson individually, and some were connected with Gipson's Market. None of the papers had any obvious significance.[17]

The State's theory was that petitioner had taken these papers during the robbery, transferred them to his brother Dan, and that Dan had thrown the papers out of his car on a late–night drive from Centerville to Dickson several hours after the murder. Presumably, the murderer was looking for something in those papers that required Gipson's murder (or so he felt), and he either failed to find what he was after, or he was successful and simply discarded those papers that were unwanted. In regard to petitioner specifically, the State's theory apparently was that he took the papers in order to remove evidence of his indebtedness, a conclusion that fits into the State's theory of petitioner's motive.

It was shown beyond dispute that Dan Delk drove by Rose Clayborn's house sometime after 11:30 on the night of the murder. The State produced two female passengers, Sheryl Weaver and Martha Dansby Overton, to testify to that. The two witnesses also testified that as Dan Delk approached the location on the north side of the Duck River Bridge near Rose Clayborn's mailbox, his tires went off the road, but he was able to return the car to the pavement safely without stopping. Both witnesses testified emphatically and without impeachment that the windows were up and that he

threw nothing out of the car. From this testimony, the State wanted the jury to draw the inference that Dan Delk did in fact throw the papers out of the window; in other words, the State wanted the jury to conclude that both witnesses were lying when they said that Dan Delk had thrown nothing out of the window, but were telling the truth about the drive and the minor mishap near Rose Clayborn's house.

*Jackson* requires this Court to defer to the jury's findings when there are conflicting inferences in a record, 443 U.S. at 326, 99 S.Ct. at 2793, and the Court cannot substitute its own conclusions for those of the jury. *See id.* at 318–19, 99 S.Ct. at 2789. However, the *Jackson* test refers to a *rational* trier of fact, and thus a district court is not free to abandon its own powers of reason in reviewing the record. In reviewing this testimony, it is simply irrational to infer from it that Dan Delk threw these papers out of his window during his trip to Dickson. First, there is absolutely no evidence that the murderer disturbed anything in Gipson's Market, much less that he took anything. But even if one assumes that the papers were taken during the robbery, the testimony of the two passengers simply fails to provide any reasonable basis for inferring that Dan Delk threw anything out of his car. The State did succeed in showing that the two women were friendly with the Delks, but there is a long way between friendship and the inference that these two witnesses were lying about Dan Delk's alleged littering, but telling the truth about everything else. Finally, even if one might infer that Dan Delk had thrown papers out of his driver's window, it is difficult to understand how they landed on the right–hand side of the road, and the State provided no theory to assist the jury in that regard.[18] The Court has viewed this evi-

---

**17.** The supreme court noted that these papers included, among other things: (1) a 1975 American Legion membership card; (2) a satisfactory chest x ray report dated February 4, 1974; (3) a food handler's certificate dated June 25, 1974; and (4) two insurance premium receipts in the sum of Twenty–Five Dollars each, one to policyholder Eugene H. Gipson and one to

Georgia H. Gipson, both dated October 17, 1975. 590 S.W.2d at 439 n.1.

**18.** The Court also notes that the road turns sharply to the left at the point where Dan Delk went off the road, which might help to explain how the mishap occurred, especially since one of the witnesses testified that he was drinking a beer during this drive.

dence in the light most favorable to the State, but it is a complete nullity.

### Conclusion.

 The State proved beyond doubt that petitioner could have killed Gipson, and that he might have had some reason to do so. The effort to connect petitioner with the papers found in Rose Clayborn's yard failed. Based upon a most searching review of this record under the *Jackson* standard, the Court must conclude that no rational trier of fact could have found petitioner guilty beyond a reasonable doubt. The writ of habeas corpus shall issue, and petitioner is to be released from his bail. As a matter of law, this judgment precludes a retrial, but if it becomes necessary to do so, the Court will not hesitate to exercise its injunctive powers under 28 U.S.C. § 2283 to prevent a retrial.[19]

---

**19.** The Court does not have the authority to order the final dismissal of the charges against petitioner, as requested in his prayer for relief. Petitioner's only threatened constitutional injury is the danger of multiple *trials*, a danger not posed by the abstract pendency of these charges. *See Drayton v. Hayes, supra*, 589 F.2d at 121. Because jeopardy does not attach until a jury has been sworn, the mere existence of charges against petitioner does not represent a threat that he will be subjected to double jeopardy. *See Crist v. Bretz*, 437 U.S. 28, 36, 98 S.Ct. 2156, 2161, 57 L.Ed.2d 24 (1978). Consequently, the enjoining of an actual retrial is the ultimate relief to which petitioner is constitutionally entitled in this Court. Petitioner's available state remedy to secure final dismissal of the charges is to move for dismissal under Rule 48(b), Tenn.R.Crim.P.