Samuel DELK, Petitioner-Appellee,

v.

Frank D. ATKINSON, Respondent-Appellant.

No. 80–5376.

United States Court of Appeals, Sixth Circuit.

Argued June 15, 1981.

Decided Nov. 25, 1981.

Tennessee Supreme Court claiming, *inter alia*, that the verdict of the jury was not supported by sufficient evidence. The supreme court reversed for trial errors and remanded for a new trial. In doing so it specifically found that the evidence was sufficient to sustain the conviction, though one justice dissented from this finding. The petitioner then sought pretrial habeas relief in the district court. The district court reviewed the evidence and concluded that the test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), had not been met since no rational trier of fact could have found from that evidence proof beyond a reasonable doubt of every element of the offense of murder. *Delk v. Atkinson*, 498 F.Supp. 1282 (1980). The district court concluded that a retrial for the same homicide would constitute double jeopardy and issued the writ.

William M. Leech, Atty. Gen. of Tennessee, Robert L. Jolley, Jr., Senior Asst. Atty. Gen., Nashville, Tenn., for respondent-appellant.

Lionel R. Barrett, Jr., William Redick, Nashville, Tenn., for petitioner-appellee.

Before EDWARDS, Chief Judge, and LIVELY and JONES, Circuit Judges.

LIVELY, Circuit Judge.

The district court granted a writ of habeas corpus which had the effect of enjoining retrial of the petitioner on a murder charge. Following his jury conviction of murder in the second degree in a state trial court the petitioner appealed to the Tennessee Court of Criminal Appeals, and ultimately to the

## I.

### A.

Though the State does not contend specifically that the petitioner failed to exhaust his state remedies we have examined the record to satisfy ourselves. Petitioner did not present his double jeopardy claim to a state trial court in bar of a retrial following reversal of his conviction. However, the Tennessee Supreme Court recognized the double jeopardy implications of the sufficiency argument, and the dissenting judge argued that there should be an outright reversal with directions to dismiss the charge rather than a remand for a new trial. In view of the fact that the Tennessee Supreme Court had decided that the evidence was sufficient, any attempt to present this double jeopardy claim to a state trial court would have been futile. See *Rachel v. Bordenkircher*, 590 F.2d 200, 204 (6th Cir. 1978). The present case differs from *Webster v. Frey*, 665 F.2d 88 (6th Cir.), decided today. In that case the Supreme Court of Kentucky reversed Webster's conviction for a procedural error and did not consider his sufficiency claim. Webster had never presented his claim of double jeopardy to a state court

and this issue had not been implicitly decided by the reviewing court. There was no basis for a claim of futility and we concluded that he had not exhausted his state remedies.

### B.

■ Pointing out that the Supreme Court of Tennessee did not reverse Delk's conviction for insufficiency of the evidence, the appellant asserts that the Double Jeopardy Clause is not offended by a retrial following reversal for trial errors. As we note, *infra*, there is support for this contention in language of the Supreme Court and this court. Nevertheless we believe that when a substantial issue of sufficiency of the evidence to sustain a conviction is properly raised on appeal but reversal is based on some other error after the court considers the evidence and finds it sufficient a defendant may seek to prevent a retrial by bringing a habeas action based on a claim of double jeopardy, provided he has exhausted his state remedies. This conclusion is founded upon the principle that one who has been convicted on the basis of proof which is insufficient to support the conviction should not be required to endure a second trial. The Double Jeopardy Clause does not just protect from a second conviction; it also protects from exposure to a second trial. *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977).

In *Burks v. United States*, 437 U.S. 1, 15, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978), the Supreme Court settled a question which had been clouded by some of its earlier decisions, holding that a defendant may not be retried where a reviewing court has reversed his conviction upon a determination that the evidence at the prior trial was insufficient to sustain the jury verdict. *Burks* involved a direct appeal in a federal prosecution. In the companion case of *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), a habeas corpus action, the Court applied *Burks* in holding that a state may not retry a defendant after his conviction has been reversed by an appellate court on the ground of insufficiency of the evidence to sustain the conviction.

In *Burks* the Court stated that when an appellate court reverses for errors in the proceedings leading to conviction the Double Jeopardy Clause does not preclude a retrial. 437 U.S. at 14–15, 98 S.Ct. at 2148–49. In so holding the Court quoted from its earlier decision in *United States v. Tateo*, 377 U.S. 463, 465, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964):

> "The principle that [the Double Jeopardy Clause] does not preclude the Government's retrying a defendant whose conviction is set aside because of an *error in the proceedings* leading to conviction is a well-established part of our constitutional jurisprudence." *United States v. Tateo*, 377 U.S. 463, 465, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964) (emphasis supplied).

437 U.S. at 14, 98 S.Ct. at 2149. In a third double jeopardy case decided on the same day as *Burks* and *Greene*, the Supreme Court stated as one of at least two "venerable principles of double jeopardy" that "[t]he successful appeal of a judgment of conviction on any ground other than insufficiency of the evidence to support the verdict . . . poses no bar to further prosecution on the same charge." *United States v. Scott*, 437 U.S. 82, 90–91, 98 S.Ct. 2187, 2193, 57 L.Ed.2d 65 (1978). See also *Gully v. Kunzman*, 592 F.2d 283, 288 (6th Cir.), *cert. denied*, 442 U.S. 924, 99 S.Ct. 2850, 61 L.Ed.2d 292 (1979).

The present case differs from *Burks* in that the reversal was for procedural error. Nevertheless, if the evidence at the prior trial was actually insufficient under the standard of *Jackson v. Virginia*, the defendant should have been acquitted, and to expose him to a second trial on the same charge would appear to be a violation of the prohibition against double jeopardy. "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceedings." *Burks, supra*, 437 U.S. at 11, 98 S.Ct. at 2147. We conclude that the

statements in *Burks, Tateo* and *Scott* refer to cases where no substantial issue of sufficiency of the evidence has been presented to and decided by a reviewing court. Where a reviewing court has considered the issue and found the evidence sufficient and the claim of double jeopardy has been urged on the reviewing court, that claim stands on no different footing than any other habeas claim of constitutional violation. The only distinguishing feature is that the rights preserved by the Double Jeopardy Clause require that the issue be resolved prior to a retrial rather than following a second conviction.

■ Bearing in mind that the Double Jeopardy Clause does not merely bar a second conviction, but also protects a person from being twice put on trial for the same offense, *Abney v. United States, supra,* 431 U.S. at 661, 97 S.Ct. at 2041, we believe the holdings in *Burks* and *Jackson v. Virginia* lead to the conclusion that there must be some means of testing the sufficiency before a second trial takes place. This follows the rationale of our decision in *Gully v. Kunzman, supra.* Thus we hold that when a state reviewing court specifically finds the evidence sufficient to support a conviction but reverses on other grounds and or-ders a new trial, the defendant may seek to prevent a retrial on double jeopardy grounds by bringing a federal habeas corpus proceeding after state remedies have been exhausted.[1]

## C.

■ The appellant also argues that 28 U.S.C. § 2254 does not permit this habeas corpus action because petitioner was not "a person in custody pursuant to the judgment of a state court . . . ." Petitioner's murder conviction had been reversed and he was free on bail at the time his application for a writ of habeas corpus was filed. However, this application was not filed under 28 U.S.C. § 2254 alone. It also sought relief under 28 U.S.C. § 2241(c)(3), which does permit the issuance of the writ at the instance of one who claims he is in custody in violation of the Constitution of the United States, regardless of· whether a judgment has been rendered. *Atkins v. Michigan,* 644 F.2d 543, 546 n.1 (6th Cir. 1981); *Moore v. DeYoung,* 515 F.2d 437 (3d Cir. 1975). One who has been released on bail while awaiting trial is in "custody" for the purposes of § 2241. See *Hensley v. Municipal Court,* 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); *Russo v. Superior Court,* 483 F.2d 7

---

1. There are a number of issues related to sufficiency of the evidence and double jeopardy which have been before the courts recently. Since none of the cases which we have examined has been concerned with the precise question now before this court, we merely identify the issues without extended discussion. The holding of *Burks* has led to claims of double jeopardy violation in cases where no determination has been made by an appellate court on the question of the sufficiency of evidence, but a retrial has been ordered. *E. g., United States v. Becton,* 632 F.2d 1294 (5th Cir. 1980), *petition for cert. denied,* —— U.S. ——, 102 S.Ct. 141, 70 L.Ed.2d 117 (1981); *United States v. Rey,* 641 F.2d 222 (5th Cir. 1981), *petition for cert. denied,* —— U.S. ——, 102 S.Ct. 318, 70 L.Ed. 2d 160 (1981).

Several courts including this one have indicated that where it is claimed on appeal from a federal conviction that the evidence was insufficient, the reviewing court is required to decide the sufficiency question even though there might be other grounds for reversal which would not preclude retrial. See *United States v. Orrico,* 599 F.2d 113, 116 (6th Cir. 1979); *United States v. Till,* 609 F.2d 228, 229 (5th Cir.), *cert. denied,* 445 U.S. 955, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980); *United States v. Meneses-Davila,* 580 F.2d 888, 896 (5th Cir. 1978); *United States v. Watson,* 623 F.2d 1198, 1200 (7th Cir. 1980); *United States v. Vargas,* 583 F.2d 380, 383 (7th Cir. 1978); *United States v. McManaman,* 606 F.2d 919, 927 (10th Cir. 1979); *United States v. U. S. Gypsum Co.,* 600 F.2d 414, 416 (3d Cir.), *cert. denied,* 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979).

In *Greene v. Massey, supra,* the Supreme Court expressly reserved the question of whether there could be a retrial following a reversal in which evidence was found to have been erroneously admitted and the legally competent evidence was insufficient to support the conviction. 437 U.S. at 26 n. 9, 98 S.Ct. at 2155 n. 9. At least two circuits have now concluded that there may be a retrial under such circumstances. *United States v. Mandel,* 591 F.2d 1347, 1371–74, *rev'd en banc on other grounds,* 602 F.2d 653 (4th Cir. 1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); *United States v. Harmon,* 632 F.2d 812, 814 (9th Cir. 1980) (per curiam).

(3d Cir.), *cert. denied,* 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973).

### D.

■ We recognize that the application for habeas relief in *Jackson v. Virginia, supra,* was brought pursuant to 28 U.S.C. § 2254 rather than § 2241(c)(3) and that it followed affirmance rather than reversal of a state court conviction. These differences do not preclude federal habeas application of the *Jackson* test of sufficiency of the evidence in the pretrial setting of this case. Several different constitutional requirements which have been delineated in a series of recent Supreme Court opinions lead to this conclusion. These are the due process requirement of sufficiency of the evidence and the double jeopardy requirements that one who has been convicted on insufficient evidence not be retried and that substantial double jeopardy claims should be considered prior to retrial. The present case appears to present a confluence of the holdings and reasoning of the Supreme Court in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and *Jackson, Burks* and *Abney, supra.* None of these decisions reached the precise issue decided here. However, the present case appears to require a logical extension of the principles enunciated by the Supreme Court in the cited cases. We conclude that the district court properly entertained Delk's application for habeas corpus relief prior to his retrial in a state court.

### II.

The evidence has been summarized and discussed in three opinions. Nevertheless, we are required to make an independent determination of its sufficiency under the *Jackson v. Virginia* standard and have read the transcript of the trial for this purpose.

The body of the victim, Harold Gipson, was found on the floor of a store which he operated in Centerville, Tennessee. The last trial witness who saw Gipson alive was Sidney Pigg who estimated that he left the store at about 5:55 p. m. on November 12, 1975. It was dark outside. Pigg walked up Columbia Avenue toward his home after leaving the store and met the defendant Delk who was walking toward Gipson's store on the opposite side of the street. In his testimony Pigg related a brief conversation with Delk and pointed out on a drawing of the area the approximate point at which Delk crossed the street to the side the store was on.

Floyd Stone testified that in the early evening of November 12th he picked up a friend, Charles Gilbert, at the home of Vorgerine Walker. As they passed Gipson's store driving "towards town," Gilbert saw the body lying on the floor, Stone backed right to the door and he and Gilbert went in. The drawer of the cash register was open, and the telephone was off the hook. The two men looked around the store and then Stone went to his mother-in-law's house and called the police, leaving Gilbert at the store. Stone testified on direct examination, and repeated on cross-examination that he was in the store for about three or four minutes.

Charles Gilbert testified that as they reached the intersection with Columbia Avenue he saw a foot lying at the entrance to Gipson's store. He went into the store first and tried to speak to Gipson. Floyd Stone came in and the two of them looked around the store, noting blood on the floor, before Stone left to call the police. Gilbert testified that nothing was moved and no one else entered the store before the police arrived.

Louise Chavers lived across the street from Vorgerine Walker. She was in Gipson's store and left to return home about 5:45 p. m. Just after the six o'clock news came on T.V. Ms. Chavers stepped out of her house and crossed the yard to the house next door where she called a man named Small who boarded with her to come to dinner. After re-entering her house the witness heard a horn sound, looked out her window and saw Floyd Stone's car "sitting over at" Mrs. Walker's.

The police dispatcher testified that he received the call that there was trouble at Gipson's store, and immediately dispatched

police to the scene at 6:09 p. m. The police reported their arrival at the scene at 6:13 p. m. The only two people inside the store when the police arrived were Stone and Gilbert. The telephone was off the hook, the cash register drawer containing $600 was open and 50 cents had been rung up. Both a back door and a side door were padlocked from the inside. The police never found the weapon which was used in the killing. Two .32 caliber bullets were removed from Gipson's body.

The sheriff of Hickman County testified that he took a statement from Delk after giving him *Miranda* warnings. Delk admitted that he was in the store the evening of November 12th, but denied shooting Gipson. He said he walked down Wells Street from his mother's home and after reaching Columbia Avenue met and spoke to Sidney Pigg in front of Louise Chavers' house. He then continued down Columbia Avenue to Gipson's store. He said he was in the store for 30 to 45 seconds, that he purchased a package of cigarettes for 48 cents and received change for a five dollar bill. Gipson was talking on the telephone, and continued to do so throughout this transaction according to Delk. He came right out of the store and started back up the "left hand side of Columbia." Delk told the sheriff that he saw Louise Chavers half way between her garage and her neighbor's house and heard her call the boarder to dinner. The area was lighted, and Delk told the sheriff that he saw Mrs. Chavers come out the back door and off the porch.

The sheriff introduced photographs of the area around the Chavers residence and testified to certain discrepancies in Delk's statement to him. The sheriff testified that there was no porch on the Chavers house, "you open the door and there's nothing there except steps." He also stated positively that Delk could not have known where Ms. Chavers came from if he was where he claims to be when he saw her. Though Delk said he looked right at Louise Chavers and she looked straight at him, Ms. Chavers testified that she never saw Delk. She said this area was lighted at night. After telling the sheriff his version of the evening's event, Delk asked him, the sheriff recounted, "Didn't Louise and Sidney Pigg tell me that they seen him which I never answered that." At that point the sheriff had not talked to them. The sheriff also testified that he had conducted and timed reenactments of the testimony of Sidney Pigg and Louise Chavers. He concluded that it would have taken 35 seconds for Pigg to have walked from the store to the place where he saw Delk and 45 seconds for Delk to have crossed the road and reached the store. Louise Chavers would have returned to her house in one minute and 17 seconds after leaving it to call the boarder. He also testified that it took Stone and Gilbert one minute and 50 seconds to reach the store from the Walker residence.

Louise Chavers testified that in October Delk and his brother got into a scuffle at a cafe owned by the decedent Gipson and a door was broken. She "guessed" that the petitioner Delk had paid for the door. The witness also testified that she had seen Delk "stand around" in an area across the road from the Gipson store where people often gathered. She had seen Delk give money to other people to make purchases for him at the store. Charles Gilbert testified that he had seen Delk go into the store and purchase cigarettes for himself. An acquaintance of Delk's related a conversation in which Delk or another person said they should rob Harry [Harold] Gipson. The witness thought the speaker was "just kidding." Another witness who characterized himself as a "good friend of Sam Delk" testified that he had given a statement to the sheriff and prosecutor in which he related a conversation with Delk concerning the deceased:

A   I told you, what I told you was that Sam said that Harry owed—that he owed Harry some money and Sam had been in the store once before and Harry forgot to give him his change and he wasn't going in—he owed the man and he wasn't going back in there, and he said he wasn't going to pay him until he give him his change, that's what that was said.

\*      \*      \*      \*      \*      \*

*THE WITNESS:* I made the statement I said Man, I said if you don't quit kicking, I said if you don't quit kicking somebody's door down Harry's done going to put something on your head and what he said that don't bother me, I got something but by that he didn't say it with no threat. I told you down there—

Q He didn't say that with any threat?

A No, he didn't say it in no threatening manner and that I took it in no threatening manner, No.

These statements were made by Delk, according to the witness, while he and Delk were standing across from Gipson's store waiting for Delk's brother to come with some money so the three of them could buy beer. The exact time of the conversation was not established, though it took place between the time of the "scuffle" at Gipson's cafe and the murder.

The State introduced considerable evidence with respect to Delk's activities after the crime. Several witnesses testified that Delk was at Gipson's cafe when someone came in and announced that Gipson had been killed. Later that evening Delk attended a party in Centerville with a group of young people. He and his brother left the party alone and drove to another town where they picked up a friend at a factory where he worked and brought him to the party. Later that night Delk's brother drove several young women home from the party. They lived in Dickson, Tennessee. There was testimony that the car swerved and nearly left the road on a curve between Centerville and Dickson. When asked if Delk's brother had thrown anything out of the car, the witness replied:

A No, he handed the beer can to Sheryl Weaver and the wind was blowing where he had it taped around the little window and anyway he was pushing up against it, as I remember and I told him to quit it if he couldn't drive to let me drive.

Q I see. But the windows were up in the car?

A Yes.

This evidence relates to the testimony of a resident of the Centerville-Dickson road. This witness, Rose Clayborn, testified that the morning after Gipson's killing she found some checks and other papers which belonged to Gipson in her yard. The papers had not been there the previous night at 11:30. The Delk car had nearly left the road adjacent to the Clayborn yard.

### III.

■ In affirming petitioner's conviction the Tennessee Court of Criminal Appeals found in an unpublished opinion that the evidence was sufficient. The Supreme Court of Tennessee reversed Delk's conviction because of the cumulative prejudicial effect of several trial errors. One error consisted of statements by the prosecutor in the presence of the jury that he had some evidence linking Delk to a handgun. Another error was related to testimony that Delk's father was seen in Gipson's store prior to the killing with a box of bullets. Another was a statement in closing argument that petitioner's brother had been present in the courtroom throughout the trial and had not been called by petitioner as a witness. The record did not establish the brother's presence. On the question of sufficiency, the supreme court concluded that "the margin by which the State prevailed was small." In responding to a vigorous dissent by one justice, the majority stated:

A further analysis of the time of death and the time of defendant's presence in Gibson's Market is in order. On the basis of the analysis narrated in section one, it was possible that seven minutes and twelve seconds was available for some third person to commit the murder, if defendant did not. We thought it self-evident that the jury could have found that less than three minutes or perhaps even only two minutes remained between the time defendant left the store and the time the body was seen by Gilbert, when the Stone car stopped in the church driveway before entering Columbia Avenue and further that because of potential eyewitnesses, anyone entering or leaving the

front door of the store would have been seen during that interval.

Defendant's statement to the Sheriff that he heard Louise Chavers' conversation with Small when only a few feet north of the store would mean that he left the store after 6:00, rather than at 5:55:20. Floyd Stone did not use the telephone in the store to call the police. He went to the Gray house located approximately two hundred ninety-nine feet north of the store, and as he passed the Walker house he took the time to inform them of the discovery of Gibson's body. The jury could have found that Gilbert and Stone *entered* the store earlier than 6:03:17 further narrowing the time and opportunity for anyone else to commit the murder.

It is undisputed that the two rear doors of Gibson's Market were bolted and locked on the inside and were not tampered with, so that the murderer would have had to enter and leave by the front door.

During the interval of time that elapsed between defendant leaving the store and the finding of the body, the following events transpired. Louise Chavers went to her front door, hearing Floyd Stone's horn blow. The well-lighted front of Gibson's Market was fully visible to her from that vantage point as her testimony about defendant sending friends into the store to make purchases had made clear. She observed Gilbert and several others outside the Walker house and Floyd Stone sitting in his car parked in front of the Walker house. All of those persons at the Walker house had a clear view of the front of Gibson's Market, as did Gilbert and Stone as they circled behind the church except for a fleeting moment when the small church building would have blocked their view. Concededly, it is possible that all of those eyes that had the opportunity to see anyone else enter and leave Gibson's Market during the entire interval that defendant must rely on for his innocence were looking elsewhere, but the probabilities are

almost nonexistent that such entry and exit occurred unobserved.

There was evidence from which the jury could have found that defendant did not arrive at Gibson's Tavern three hundred and fifty feet from the murder scene until approximately 6:20 p. m.

It was established that a bundle of papers were taken from Gibson's Market and we think, beyond a reasonable doubt, that the taking occurred at the time of the murder. Among the papers were notations of amounts various persons owed Gibson and bad checks that had been given to Gibson and remained unpaid. The conclusion is inescapable that there was something among those papers that was more valuable to the murderer than the six hundred dollars cash in the open cash drawer. The jury could have found that defendant owed Gibson money for cigarettes, groceries, beer or the door that was damaged in the altercation "with his brother." The brother could have been Dan Delk, the record does not reveal whether defendant had other brothers.

The failure of defendant to call Dan Delk was significant for several reasons. One of the two women passengers who testified about his activities when his vehicle passed Mrs. Claiborne's house acknowledge that she had "stayed" with him and, of course, the other one was a friend. The jury was not required to accept their testimony, which was far from convincing and unequivocal, on its face. Why would a defendant charged with a capital crime fail to put his available brother on the witness stand to state unequivocally that he was given no papers by defendant or anyone else on the night of the murder and that he did not deposit them beside the highway near Mrs. Claiborne's house? The answer may well be that he did so, or that he knew that defendant owed Gibson money and there was bad blood between them, or both.

*Delk v. State*, 590 S.W.2d 435, 441–42 (Tenn.1979).[2] (Throughout the transcript the victim's name is spelled "Gipson." It is only spelled "Gibson" in the Tenn. Supreme Court opinion. The witness Clayborn's name is also spelled differently.)

The dissenting justice took an entirely different view of the evidence, concluding that the State had proven nothing but presence. The majority responded as follows:

> The proof of presence and the opportunity to commit the murder, with no eyewitness to the killing, was conclusive and was coupled with a time sequence that would support a finding beyond a reasonable doubt that no one else could have entered the store, committed the crime, and left unobserved.

*Id.* at 442.

In the habeas corpus proceedings the district court conducted a painstaking review of the evidence and came to the following conclusion:

> The State proved beyond doubt that petitioner could have killed Gipson, and that he might have had some reason to do so. The effort to connect petitioner with the papers found in Rose Clayborn's yard failed. Based upon a most searching review of this record under the *Jackson* standard, the Court must conclude that no rational trier of fact could have found petitioner guilty beyond a reasonable doubt.

*Delk v. Atkinson*, 498 F.Supp. 1282, 1294 (M.D.Tenn.1980). The district court granted the writ and released Delk from his bail.

## IV.

### A.

In *Jackson v. Virginia*, 443 U.S. 307, 309, 99 S.Ct. 2781, 2784, 61 L.Ed.2d 560 (1979), the Supreme Court stated the question for decision as "... what standard is to be applied in a federal habeas corpus proceeding when the claim is made that a person has been convicted in a state court upon insufficient evidence." After discussing the nature of this claim, particularly as defined by its previous decision in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Court answered its question as follows:

> After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS*, 385 U.S., [276] at 282 [87 S.Ct. 483, 486, 17 L.Ed.2d 362] (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson v. Louisiana*, 406 U.S., [356] at 362 [92 S.Ct. 1620, 33 L.Ed.2d 152] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.[13]

---

13 The question whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached. Just as the standard announced today does not permit a court to make its own subjective determination of

---

2. There is a presumption that factual findings of a state reviewing court are correct when such findings are challenged in a federal habeas corpus action. *Sumner v. Mata*, 449 U.S. 593, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

guilt or innocence, it does not require scrutiny of the reasoning process actually used by the factfinder—if known. See generally 3 F. Wharton, Criminal Procedure § 520 (12th ed. 1975 and Supp.1978).

443 U.S. at 318–20, 99 S.Ct. at 2789 (emphasis in original) (footnotes 11 and 12 omitted).

In reaching the conclusion that the petitioner in *Jackson* was not entitled to habeas relief, the Court specifically declined to adopt a rule that the prosecution has an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt. Rather, the Court stated that under the standard announced in its decision, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." 443 U.S. at 326, 99 S.Ct. at 2793.

In an opinion by Senior Judge John W. Peck this court anticipated the decision in *Jackson v. Virginia*. See *Speigner v. Jago*, 603 F.2d 1208 (6th Cir. 1979), *cert. denied*, 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980). The *Jackson v. Virginia* standard has been applied most recently by this court in *Scott v. Perini*, 662 F.2d 428 (6th Cir. 1981). In *Scott*, Judge Engel, writing for the majority, concluded that the evidence was sufficient to support the conviction. Scott and Speigner had been charged jointly with homicide, but tried separately.

## B.

■ The district court recognized the delicacy of its task in view of the fact that the trial judge had found the evidence sufficient to withstand a motion for a directed verdict of acquittal, the jury had found no reasonable doubt of guilt, and two state reviewing courts had concluded that the evidence was sufficient. 498 F.Supp. at 1285. This was a close circumstantial evidence case. Since the petitioner did not testify, the jury had only his statement to the sheriff from which to learn his version of the events of November 12, 1975.

Though some features of his statement were corroborated by the testimony of Sidney Pigg and Louise Chavers, there were discrepancies. Most notably, Delk said he saw Ms. Chavers when they were a short distance apart in a well-lighted area and that she looked directly at him. Louise Chavers said she never saw petitioner though she accurately described the activities of other persons who were in the same area. Further, the sheriff testified that Ms. Chavers' movements could not have been seen from the spot where Delk said he saw her. The significance of this discrepancy is that Ms. Chavers went into her yard after noticing that it was 6:00 p. m. by her clock and that the evening news had commenced on television. If that was when Delk was walking away from the store, as he stated, it could be found that he had left the store at least seven minutes before the body was discovered. However, if the jury believed that Delk had not seen Ms. Chavers after leaving the store, as he stated, but had heard her call her boarder as he (Delk) walked down toward the store, it could have concluded that he reached the store a short time after 6:00 rather than some time before the hour. If the jury also believed the testimony of Floyd Stone who could not have arrived before 6:02 that he stayed in the store as much as four minutes before leaving to make a telephone call to the police which was received shortly before 6:09 p. m., the jury could have concluded that only two or three minutes elapsed between the time Delk left the store and the discovery of the body.

The conclusion of the Supreme Court of Tennessee and the district court that the jury could have reasonably found that only two or three minutes elapsed between the time the petitioner left the store and Gilbert sighted Gipson's body from the passing car is correct. Though the Tennessee court went on to conclude that the evidence established that no one else had the opportunity to enter the store and kill Gipson and leave the store unobserved after Delk left, that conclusion is not required for our purposes. As the district court pointed out, no

one saw Delk leave either. On habeas review, there is no requirement that all other interpretations of the evidence except guilt of the defendant be ruled out. *Jackson, supra*, 443 U.S. at 326, 99 S.Ct. at 2793. We must view the evidence most favorably to the state and must assume that the jury resolved all conflicts in favor of the prosecution. *Id.*

### C.

Applying the foregoing rules to the facts of this case, we must disagree with the holding of the district court. Much of the evidence was of a type which did not involve credibility or resolution of conflicts. Nevertheless, there were conflicts to be resolved and it was necessary to determine the weight to be given to some of the evidence, particularly with respect to past trouble between Delk and the victim. Though it was unintentional, we conclude that the district court did not grant to the verdict the assumption that all conflicts had been resolved in favor of the prosecution. We also believe the district court undertook to determine the proper weight to be ascribed to certain evidence. We have discussed the discrepancies between Delk's statement and other proof which the jury heard. With respect to the weight of the evidence, the jury had uncontradicted proof of some previous trouble between Delk and the deceased. Though both witnesses gave their opinions that words of Delk's which might have been considered threatening were not serious, the jury was entitled to decide for itself whether past trouble between Delk and Gipson had reached the point where Delk was threatening some sort of retaliation. The jury could have concluded that the presence of $600 in an open cash register after the killing indicated that the killer had some motive other than robbery. Though the problems between Delk and Gipson appear trivial, it is not irrational to believe they had reached the point where the tragic death of one of the parties could have resulted from them.

The evidence concerning the papers found on the Centerville-Dickson road, though not conclusive, offers additional proof which the jury could have considered in reaching its verdict. The papers definitely came from Gipson's store. The proof showed indisputably that if Delk took the papers from the store he had several opportunities to deliver them to his brother. It was also shown that late on the night of the murder Delk's brother's car almost left the road at a point near where the papers were found. Further, the witness in whose yard the papers were found the next morning testified that they were not there as late as 11:30 p. m. on November 12th. While two passengers in the car testified that nothing was thrown out, one of them stated that at the time the car nearly left the road the driver was pushing against the window vent which was taped shut. The Supreme Court of Tennessee properly held this evidence admissible, and the jury was entitled to determine the weight to be given to these coincidences and the credibility of the witnesses who related them.

After reviewing all the evidence according to the prescription of *Jackson v. Virginia*, we conclude that a rational jury could have found Delk guilty beyond a reasonable doubt of second degree murder in the killing of Harold Gipson. The judgment of the district court is reversed with directions to dismiss the application for habeas corpus.

NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.

To place my concurring views and my disagreement in context, a brief factual framework is required. Samuel Delk was convicted of second degree murder by a jury in Tennessee state court for the slaying of Harold Gipson. Both before and after the jury verdict, Delk moved the trial court for acquittal. The motions were denied. On appeal, the Tennessee appellate court affirmed the conviction and the Tennessee supreme court granted certiorari. In view of several trial errors, the divided supreme court reversed Delk's conviction and remanded the case for a new trial. In doing so, the supreme court held that circumstantial evidence of Delk's presence at

the scene of the crime, opportunity to commit the murder and the critical time sequence constituted sufficient evidence to support the jury conviction. A single dissenting justice decried the insufficiency of the evidence. Thereafter, Delk sought the instant federal habeas corpus relief in the district court alleging that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. The district court agreed and issued the writ. Today the majority holds, in effect, that the district court had jurisdiction to review Delk's claim that his forthcoming retrial would violate the double jeopardy clause of the Fifth Amendment because his original conviction was based on insufficient evidence. The majority further holds that the district court erred in finding the circumstantial evidence of guilt insufficient as a matter of law. For the reasons stated *infra*, I concur in the majority's holding on the double jeopardy issue and dissent from the reversal on the sufficiency claim.

### I.

Delk filed his application for a writ of habeas corpus under 28 U.S.C. § 2241(c)(3). At the time, he was free on bail pending retrial of his second degree murder conviction in state trial court. Because Delk challenged, throughout the state proceedings, the sufficiency of the evidence to sustain the jury verdict, the district court concluded that it had jurisdiction to consider whether Delk's retrial would subject him to a second jeopardy. As I read the majority's opinion, this Court interprets the principles enunciated in *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) and *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) to stand for the proposition that a state prisoner, who has exhausted his state remedies, may bring a federal habeas corpus proceeding prior to retrial to test the evidentiary sufficiency of his original state court conviction. While I agree with this conclusion, and the underlying reasoning, I write separately on this point to emphasize my belief that such a claim is clearly cognizable under the double jeopardy clause of the Fifth Amendment, as

applied to the states through the due process clause of the Fourteenth Amendment.

It is evident that the double jeopardy clause serves at least three fundamental purposes. First, upon entry of a judgment of acquittal, the double jeopardy clause prohibits a retrial for the same offense. *Fong Foo v. United States*, 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962); *Burke v. United States, supra*, 437 U.S. at 10–11, 98 S.Ct. at 2146–47; *Sanabria v. United States*, 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978). Second, the double jeopardy clause proscribes multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969); *Whalen v. United States*, 445 U.S. 684, 688, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980). Third, the double jeopardy clause bars a second prosecution on the same offense for which the defendant has already been convicted. *Brown v. Ohio*, 432 U.S. 161, 165–69, 97 S.Ct. 2221, 2225–27, 53 L.Ed.2d 187 (1977). Furthermore, because the federal constitutional guarantee against double jeopardy applies to the states through the Fourteenth Amendment, *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), state criminal defendants enjoy the full benefit of these three aspects of the double jeopardy clause as soon as the jury is empaneled and sworn. *Crist v. Bretz*, 437 U.S. 28, 32–38, 98 S.Ct. 2156, 2159–62, 57 L.Ed.2d 24 (1978).

Recent applications of the aforementioned double jeopardy principles are instructive for our present purposes. In *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), a state prisoner moved the state trial court for a new trial alleging evidentiary insufficiency of his jury conviction for first degree murder. The state trial court agreed and granted his motion. After his second trial resulted in a guilty verdict, the defendant filed an application for a writ of habeas corpus in the state court. The application was denied. On certiorari, the U.S. Supreme Court reversed holding that once the trial court found evidentiary insufficiency retrial was prohibited. Prior to *Hudson*, in *Burks v. United*

*States, supra,* the Supreme Court precluded the possibility of a new trial once a reviewing court found the evidence to be legally insufficient. The Court concluded that "it should make no difference that the *reviewing* court, rather than the trial court, determined the evidence to be insufficient." *Id.* 437 U.S. at 11, 98 S.Ct. at 2147. For double jeopardy purposes, the *Burks* court distinguished between reversals on the grounds of evidentiary insufficiency and reversals based upon trial errors. Finally, in *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), the *Burks* principles were applied to a federal habeas corpus review of a state prisoner's claim that his retrial and reconviction for first degree murder, after the state supreme court reversed his original conviction on evidentiary insufficiency grounds, offended the double jeopardy clause. Persuaded by the defendant's rationale but unsure of the basis of his new trial, the Supreme Court remanded the case for further consideration.

In my view, these basic principles of double jeopardy, as elucidated by *Hudson, Burks* and *Greene,* suggest two significant conclusions. First, the various purposes of the double jeopardy clause are well served by pre-trial federal habeas corpus review of the evidentiary sufficiency of a prior state court conviction when a second trial has been ordered. The prevention of a second prosecution for the same offense in the face of palpably insufficient evidence to sustain the first conviction preserves the defendant's fundamental constitutional right against a second jeopardy. In this circumstance, a federal habeas corpus court should be able to review the evidence, to find it insufficient to support the state court conviction, and to order the defendant released. Second, and the basis of my special concurrence, I believe that pretrial federal habeas corpus under the circumstances of this case flows from the principles espoused by *Hudson, Burks, Greene* and other double jeopardy cases. These cases involved the Supreme Court's consideration of the double jeopardy implications of retrials conducted in spite of a reviewing court's finding of insufficient evidence to sustain the conviction. Moreover, *Hudson* and *Greene* reviewed state and federal habeas corpus proceedings instituted after retrial. Therefore, I believe that the Supreme Court's holdings in these cases subsume the present case.

Consequently, I concur with the majority that in the interest of guaranteeing a single jeopardy for state prisoners once the highest state reviewing court has determined the issue of sufficiency of the evidence to support the jury verdict but orders a new trial on other grounds, the prisoner may seek pretrial federal habeas corpus review on the evidentiary sufficiency of his conviction.

## II.

On the second issue, I reluctantly part company with the majority. Delk contends that his conviction for second degree murder contravened the due process clause of the Fourteenth Amendment because it was based upon insufficient circumstantial evidence. *Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979). With one justice dissenting, the Tennessee supreme court disagreed. *Delk v. State,* 590 S.W.2d 435 (Tenn.1979). On federal habeas corpus review, the district court held that the evidence was insufficient as a matter of law. *Delk v. Atkinson,* 498 F.Supp. 1282 (M.D.Tenn.1980). The opinion of the majority reverses the district court, holding that a rational jury could have found Delk guilty beyond a reasonable doubt. In so holding, the majority places this Court's imprimatur on the state courts' conclusion that mere presence at the scene of the crime and opportunity to commit the crime suffice to prove guilt beyond a reasonable doubt. I respectfully dissent.

### PRESENCE AND OPPORTUNITY

The operative facts as found by the Tennessee supreme court and the district court are not in dispute. On November 12, 1975, as Buford Hornbeck left Harold Gipson's grocery store, his watch showed 5:50 p. m. Sidney Pigg was in the store with Hornbeck. Pigg testified that he left the store five minutes after Hornbeck or at approxi-

mately 5:55 p. m. When Pigg departed, Gipson was left alone in the store. Pigg encountered defendant Delk who was on his way to the store. After this encounter, Delk entered Gipson's Market and bought a pack of cigarettes. According to Delk, Gipson was engaged in a telephone conversation the entire time that Delk was in the store. Delk left the store and proceeded south on Columbia Avenue near the house of Mr. Small, Louise Chavers' boarder. Shortly after 6:00 p. m., Louise Chavers called Mr. Small to supper. Delk heard Ms. Chavers and saw her near Mr. Small's house. At approximately 6:03 p. m. Floyd Stone and Goon Gilbert entered Gipson's Market. They discovered Mr. Gipson's body on the floor and the telephone off the receiver. Stone reported Gipson's murder to the Centerville Police Department at 6:09 p. m. Soon thereafter, the customers of Gipson's tavern were informed of the murder. Defendant Delk was in the tavern. The following day, Delk gave a statement to Sheriff Atkinson in which he acknowledged his encounter with Sidney Pigg, his purchase at Gipson's Market, and his proximity to Louise Chavers.

On the basis of these facts, the Tennessee supreme court found that Delk had two to eight minutes in which to shoot Harold Gipson; that Delk had entered and left Gipson's Market unobserved; that though the State prevailed by a "small" margin, its proof was sufficient to take the question of Delk's guilt or innocence to the jury; and that the State's proof of Delk's presence in Gipson's Market, opportunity to murder Gipson and the short time sequence supported the jury verdict of guilt beyond a reasonable doubt.

Federal habeas corpus review of the sufficiency of the evidence to sustain a state criminal conviction necessarily commences with the recognition of "proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process ...." *Jackson v. Virginia, supra* 443 U.S. at 318, 99 S.Ct. at 2789. This reasonable doubt standard arises from the fundamental constitutional doctrine of *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). "*Winship* presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof ...." *Jackson v. Virginia, supra* 443 U.S. at 316, 99 S.Ct. at 2788. Therefore, the critical inquiry on review of evidentiary sufficiency is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. at 2789.

Recently, in two related cases, this Court tested the sufficiency of circumstantial evidence against the reasonable doubt standard. *Speigner v. Jago*, 603 F.2d 1208 (6th Cir. 1979), *cert. denied*, 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980); *Scott v. Perini*, 662 F.2d 428 (6th Cir. 1981). In *Speigner*, Henry Speigner was tried in Ohio state court for the murder of William Bell. The prosecution presented testimony of a state highway patrolman who stopped Bell's automobile for a safety violation. The vehicle was driven by Roger Scott. Speigner was Scott's passenger. In response to questioning by the patrolman, Scott stated that he had rented the vehicle from Bell. Scott and Speigner were amused that they had been "stuck" with an unsafe vehicle. To refute the rental story, the prosecution adduced evidence that Bell used his car in his business and never lent it to anyone. The prosecution also introduced evidence that certain documents discovered in a briefcase in the car's trunk were to be filed by Bell on the following morning. Scott was arrested for the safety violation and Speigner was released in order to obtain bail for Scott. Instead, Speigner disappeared and was later apprehended in New York. Thereafter, the prosecution presented certain physical evidence which had been inventoried by the police when the car was impounded. That evidence included shattered window glass from Bell's car, blood stains of the victim's type on the rear seat, a bloody fingerprint of an undetermined origin on the door and a sawed-off shotgun

under Speigner's seat. Finally, the prosecution proved that Bell's body was discovered lying in a Cleveland, Ohio street approximately two hours after Scott and Speigner were stopped on the highway. Bell had bullet wounds in the chest and shotgun wounds in the back of the head. On the basis of this proof, the state court jury convicted Speigner of second degree murder which in Ohio was defined as "purposely and maliciously kill[ing] another." *Speigner v. Jago, supra* at 1209 n.1.

After exhausting his state remedies, Speigner filed a petition for federal habeas corpus relief alleging that insufficient evidence supported the jury conviction. The district court agreed and granted the requested relief. On appeal, this Court held that though the record contained "some" circumstantial evidence, it lacked constitutionally sufficient evidence for the trier of the fact to find that Speigner actually killed or participated in the killing of Bell. This conclusion was based upon the dearth of evidence concerning the length of time Speigner had spent in Bell's car when it was stopped, the prosecution's failure to connect Speigner to the shotgun found underneath his seat in Bell's car, the prosecution's failure to link the weapons used to murder Bell with the shotgun discovered in his car, and the prosecution's failure to establish that Speigner had used a gun of any kind. *Id.* at 1213.

Speigner and Scott were tried separately. Scott was convicted of first degree murder. The Ohio appellate court reduced Scott's conviction to second degree murder. Finding evidentiary insufficiency, the district court granted Scott's petition for federal habeas corpus relief. Though the prosecution presented basically the same proof as it had at Speigner's trial, this Court reversed the grant of habeas corpus relief holding that "the incremental quantum of evidence in Scott's case compel[led] a different result." *Scott v. Perini, supra* at 433. This "incremental quantum of evidence" included statements Scott made to a police officer while being transported from the Mahoning County jail in Youngstown to Cleveland. Those statements arguably placed Scott,

Speigner and Bell together in Bell's car around the time the murder occurred. From these statements, this Court concluded that a reasonable jury could have found "that Scott and Speigner formed a decision to kill Bell and either or both of them carried out the plan by shooting Bell with his own pistol, later discarded, and by shooting him in the back of the head with the sawed-off shotgun which was later found in the car in which they were stopped." *Id.* at 434.

My dissent in *Scott v. Perini, supra,* grew out of my continuing belief that mere presence at the scene of the crime and opportunity to perpetrate the crime, without more, cannot satisfy the reasonable doubt standard of *Jackson v. Virginia, supra,* and *In re Winship, supra.* I remain profoundly troubled by the serious inconsistencies between *Speigner* and *Scott.* Virtually the same evidence that the *Speigner* majority mustered to find evidentiary insufficiency for Speigner's conviction was utilized to find sufficient evidence to sustain Scott's conviction. In my view, the majority's attempt to distinguish *Speigner* and *Scott* on the basis of three inconsistent statements made by Scott failed to thrust Scott's conviction over the sufficiency hurdle established by the reasonable doubt standard.

The majority's holding here, I fear, moves this Court even further in the direction of sanctioning constitutional short cuts to convictions in state courts.

Due process mandates that no one will be convicted of a crime unless the prosecution produces sufficient evidence to prove every element of the crime beyond a reasonable doubt. It is abundantly clear, therefore, that constitutionally sufficient evidence necessary to prove guilt beyond a reasonable doubt does not vary merely because the prosecutor's proof is direct or circumstantial. Consequently, under the teachings of *Jackson, Speigner* and *Scott,* this Court must review the circumstantial evidence underlying Delk's conviction to determine whether a rational factfinder, viewing that evidence in a light most favorable to the

prosecution, could have found the essential elements of second degree murder under Tennessee law beyond a reasonable doubt.

According to the Tennessee state courts, the elements of second degree murder are the willful and malicious killing of another by a person under the influence of a sudden impulse of passion who acted without adequate provocation, *see Bailey v. State*, 479 S.W.2d 829 (Tenn.Crim.App.1972), and without "any previously formed design to kill." *Gordon v. State*, 478 S.W.2d 911, 916 (Tenn. Crim.App.1971). Expressed or implied malice is an essential element of the crime of second degree murder. *Farr v. State*, 591 S.W.2d 449 (Tenn.Crim.App.1979). Malice may be implied from all the circumstances surrounding the murder. *State v. Gilbert*, 612 S.W.2d 188 (Tenn.Crim.App.1980).

In this case, the lower courts held, and I agree, that the prosecution proved Delk's presence at the Gipson's Market between 5:55 p. m. and 6:03 p. m. on the evening of November 12, 1975. Delk's own statement to Sheriff Atkinson on the following day, in which Delk admitted purchasing a pack of cigarettes from Gipson prior to those fatal moments and overhearing Louise Chavers call her boarder as he (Delk) left the store, demonstrates that Delk had an opportunity to commit the murder. However, in the absence of proof of the essential elements of the crime of second degree murder, proof of presence and opportunity do not satisfy the reasonable doubt standard of *Jackson*. As described above, these elements included the existence of a "willful and malicious" *mens rea* coupled with the nonexistence of "adequate provocation" or "design to kill." Rather than addressing these deficiencies in the proof of second degree murder, the Tennessee supreme court rested its decision on Delk's presence and opportunity. In view of the U.S. Supreme Court's construction of the due process clause in *Jackson v. Virginia, supra,* I believe that this Court is duty bound as a reviewing court in federal habeas corpus proceedings to overturn Delk's conviction since it was unsupported by proof of an essential element of the crime.

## LACK OF MOTIVE

At Delk's trial, the prosecution attempted to prove the requisite *mens rea* of first degree and second degree murder by adducing evidence that Delk had a motive or a reason for killing Gipson. Under the prosecution's theory, animosity existed between Delk and Gipson because Gipson made Delk pay for the damage he and his brother Dan had done to the door of Gipson's tavern during an altercation. According to the prosecution, this animosity was manifested by Delk's practice of having other people make purchases for him at Gipson's Market. The prosecution also showed that Delk owed Gipson an undetermined amount of money for beer. Additionally, the prosecution introduced testimony to the effect that Delk and Wayne Dansby had thought about robbing Gipson.

The Tennessee state courts were unconvinced by the prosecution's proof of "motive." As the district court observed, the Tennessee court of criminal appeals discounted Delk's "previous difficulty" with Gipson as not appearing serious and the Tennessee supreme court accorded the proof little weight. 498 F.Supp. at 1292. In fact, as dissenting Justice Henry noted, "[t]he record shows that Sam Delk had paid for the door repairs." 590 S.W.2d at 445. Moreover, the alleged manifestation of Delk's animosity toward Gipson by having others make purchases for him was discredited since Delk entered Gipson's Market on three separate occasions during that fateful day. 590 S.W.2d at 446. Finally, uncontradicted proof established Delk's conversation with Wayne Dansby concerning the possible robbery of Gipson's Market was in jest. 498 F.Supp. at 1292. Indeed, robbery was not the motive for the slaying of Harold Gipson because the assailant left more than $1,100.00 on Gipson's person and in the cash register.

Despite the prosecution's failure to prove Delk's motive for allegedly killing Gipson, the majority herein concludes that "it is not irrational to believe they [the problems between Delk and Gipson] had reached the point where the tragic death of one of the

parties could have resulted from them." This conclusion flies in the face of the Tennessee state court's factual determination that the "previous difficulty" between Delk and Gipson "did not appear serious." 590 S.W.2d at 446. This factual determination should be presumed correct for the purposes of federal habeas corpus relief. *Sumner v. Mata,* 449 U.S. 593, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

Absent sufficient proof of motive, the prosecution did not establish the requisite purposefulness for first or second degree murder under Tennessee law. In view of this failure to prove the essential elements of the crime of second degree murder, Delk's conviction was based upon insufficient evidence in violation of the due process clause as construed by *Jackson v. Virginia, supra.* Furthermore, without proof of motive, the majority's holding that the conviction was supported by sufficient evidence contravenes the principles this Court espoused in *Speigner* and *Scott.* As previously stated, Speigner's conviction was reversed because the prosecution therein failed to prove that he "actually killed or participated in the killing of the victim, an essential element of second degree murder under [Ohio law]." 603 F.2d at 1213. Scott's conviction was upheld by this Court on the majority's theory that "Scott and Speigner formed a decision to kill Bell and either or both of them carried out the plan by shooting Bell ...." *Scott v. Perini, supra* at 434. No comparable situation exists in the present case. Instead, the Tennessee supreme court and the majority here rest their affirmance of Delk's conviction on evidence of mere presence at the scene of the crime and opportunity to commit the crime coupled with the narrow time sequence in which the murder was committed.

**THE DISCARDED PAPERS**

The prosecution also introduced certain business and personal papers of Harold Gipson which were removed from Gipson's Market at the time of his murder and later discovered near Rose Claiborne's mailbox on the morning after the murder. Under the prosecution's theory, Dan Delk discarded those papers on the evening of the murder as Dan feigned to lose control of his car at or near Claiborne's residence. The inference, of course, being that Sam Delk murdered Gipson in order to retrieve important documents that he subsequently disposed of and that his brother discarded the remaining worthless papers.

I cannot accept this theory as logical and I consider it wholly unsupported by the facts as found by the state courts. First, Dan drove on the opposite side of the road from Claiborne's property so that even if he had an opportunity to jettison Gipson's papers, those papers would not have settled near Claiborne's mailbox. Second, both of Dan's female passengers testified that though he was pressing up against the loosely-taped vent window with his shoulder he did not throw away any papers. In fact, Dan was driving with one hand and drinking beer with the other hand at the time. Additionally, it was a cold night and all the car windows were sealed. Third, Sam Delk could just as easily have burned Gipson's papers rather than having Dan dispose of them in the presence of two witnesses. Fourth, the Tennessee supreme court placed very little evidentiary weight on this evidence.

Therefore, as the district court properly held, "it is simply irrational to infer from [the testimony of Dan's female passengers] that Dan Delk threw these papers out of his window during his trip to Dickson." 498 F.Supp. at 1293. The presence of the papers on Claiborne's property and the coincidence of Dan's drive past that property failed to prove Sam Delk's control over the papers or link him in any way to the Gipson murder.

**CONCLUSION**

Delk's conviction rests upon wholly circumstantial evidence of his presence at the scene of the crime and his opportunity to have committed the crime. No murder weapon was recovered, no eyewitness testified to Delk's involvement in the murder, no witness heard any shots fired, no motive was established linking Delk to the murder, and no reasonable inferences of Delk's guilt

could have been made from the recovery of Gipson's papers. All the prosecution proved is that whoever committed this heinous crime had very little time in which to do it and yet escape unnoticed.

If due process of law is to retain any meaning in our society of laws and if the public is to continue to have any degree of confidence that an individual will not be imprisoned except upon constitutionally sufficient proof of guilt beyond a reasonable doubt as to every element of the crime charged, then the State's circumstantial proof of presence and opportunity standing alone must be found to constitute insufficient evidence to support a jury conviction.

I would affirm the judgment of the district court granting habeas corpus relief.